**RECEIVED**

CJK&EL/2008R01130     **MAR 17 2011**

AT 8:30_____M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

11 -161 (9mp)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. |
| | : | 18 U.S.C. § 371 |
| v. | : | 28 U.S.C. § 2461(c) |
| | : | |
| CHRISTOPHER RAD | : | INDICTMENT |
| | : | |

R E C E I V E D

MAR 17 2011

AT 8:30_____M
WILLIAM T. WALSH
CLERK

        The Grand Jury in and for the District of New Jersey,

sitting in Newark, charges:

## BACKGROUND

### Defendant and Others

        1.    At all times relevant to this Indictment:

        a.    Defendant CHRISTOPHER RAD was a resident of Texas.

Defendant RAD acted as a middleman between stock promoters

seeking to pump shares of stock, and computer experts located

inside and outside of the United States who used various means,

including "spam" e-mail campaigns, "botnets," and hacking to pump

the stock.

        b.    James Bragg, who is named as a co-conspirator but

not as a defendant herein, was a United States citizen residing

in Thailand.  Bragg sent spam e-mails in furtherance of a "pump

and dump" scheme to manipulate the prices of stock sold over the

national exchanges.  To further the distribution of the spam,

Bragg engaged the services of other computer programmers who used

malicious software to infect computers and thereby distribute massive amounts of spam.

        c.    Promoter #1, who is named as a coconspirator but not as a defendant herein, was a resident of Florida and acted as a stock promoter.  Promoter #1's clients consisted of penny stock companies whose stock was traded over the counter through quotations services such as those operated by Pink Quote (the "Pink Sheets").  Promoter #1 promised clients that he would raise equity for their companies by orchestrating stock promotion campaigns.  In fact, Promoter #1 devised a method to evade federal securities registration requirements in order to (a) hide from the general investing public the actual financial condition and business operations, or lack thereof, of the issuers of certain stock; and (b) provide the coconspirators with millions of unregistered and unrestricted, i.e., free-trading, shares of issuers' stock, which the coconspirators could not legally obtain directly from the issuers for resale to the general investing public.

        d.    B.T. and D.S., who are named as co-conspirators but not as a defendant herein,  resided outside the United States and worked as e-mail spammers and hackers.  B.T. and D.S. distributed their e-mail by using a botnet to send spam and avoid anti-spam technology employed by Internet service providers.

        e.    Company #1 was a Nevada corporation purportedly engaged in the business of designing and installing security

- 2 -

systems, including video-monitoring equipment.  The common stock of Company #1 was traded on the Pink Sheets.

**"Pump and Dump" Schemes**

2.    At all times relevant to this Indictment:

a.    Individuals engaged in manipulating stock prices often used a "pump and dump" scheme.  The term "pump and dump" refers to a scheme to manipulate the price and volume of a particular stock in order to later sell that stock at an artificially inflated price.  As part of the scheme, the perpetrators first obtained control over a substantial portion of the free trading shares of a particular company.  Free trading shares were shares of stock that the owner could trade without restriction on a national exchange, e.g., the New York Stock Exchange or NASDAQ, or were traded in the over-the-counter market.  Once the perpetrators acquired free trading shares, the "pump" was effectuated in one of several ways.  Usually, the pump involved disseminating misleading promotional materials – unsolicited advertisements touting a particular stock and encouraging others to purchase the stock – which often were sent to millions of recipients by fax or "blasts" of e-mails.  The e-mail blasts were effectuated through the use of botnets, which were collections of computers infected with malicious software and controlled by a hacker.  The perpetrators further hacked into the brokerage accounts of unsuspecting third parties, liquidated the existing holdings and used the balance to trade in a particular stock, thereby pumping up the stock price.  The

perpetrators further pumped the stock price by engaging in manipulative trading of the stock, such as engaging in matched trades, i.e., prearranged purchases and sales of set quantities of stock at a predetermined price, in order to create the fictitious appearance of a more active market for that stock. After pumping the stock, the perpetrators "dumped" the shares; that is, they sold large volumes of the shares that they owned and controlled to victim-investors.  Once the perpetrators dumped the stock, the stock price typically fell, and the victim-investors suffered a loss.

        b.    The Securities and Exchange Commission ("SEC") issued regulations that governed the purchase of stock.  The purpose of such regulations was, in part, to limit manipulative stock schemes.  Rule 504 of Regulation D, 17 C.F.R. § 230.501 et seq. ("Rule 504"), exempted from the registration requirements limited offers and sales of securities that did not exceed $1,000,000 if, among other things, the offers and sales were made in compliance with a state law exemption from registration and were sold only to "accredited investors."  Rule 504 did not exempt from registration share issuances involving underwriters and schemes designed to cause the distribution of shares to the general investing public.

        c.    Texas Administrative Code § 139.19 ("TAC § 139.19") provided an exemption from registration under Texas law for offers or sales of securities to an "accredited investor" if the accredited investor purchased shares for investment and not

with a view to or for sale in connection with a distribution of the security.  Any resale of the security within twelve months was presumed to be with a view to distribution, not for investment, unless sold to another accredited investor pursuant to a valid exemption under Texas securities law.

        d.    To circumvent such regulations, perpetrators of pump and dump schemes obtained free trading shares of stock through the use of false and misleading documents.  One method of obtaining free-trading shares was to secure an opinion letter from an attorney which certified that trading restrictions on the shares could be lifted because certain conditions set forth in the regulations were met.  Perpetrators of pump and dump schemes therefore sought such opinion letters and provided the attorneys with false and misleading information which formed the basis of the opinion letters.  Additionally, to fall within the jurisdiction of states with favorable regulations, such as Texas, perpetrators of pump and dump schemes created shell corporations in such states.  Once the perpetrators of pump and dump schemes obtained such opinion letters they generally forwarded them to a "transfer agent" - a company, often a bank or trust company, retained by publicly traded companies to keep track of the individuals and entities that own their stock - and requested that the transfer agent release shares of stock to the perpetrators without restriction.

**Spam and Botnets**

        3.    At all times relevant to this Indictment:

a.   "Spam" was a commonly used term for unsolicited bulk commercial e-mail.  Certain kinds of fraudulent techniques were used by "spammers" to misrepresent and disguise their identity, location, or the nature of their messages in order to defeat spam filtering programs and other spam blocking techniques employed by Internet service providers and e-mail users, get into e-mail user accounts, and trick recipients into opening and acting on spam e-mails.  For example, the origin of a spam e-mail could be disguised by inserting false "header information" (which included addressing information such as the "from," "to," "reply-to," and/or "subject" lines), or by routing the e-mail through another computer that could not be traced to the true sender.

b.   Google, Yahoo, AOL and other mail providers instituted mail-filtering software to block spam.  To avoid such mail-filtering software and to further disseminate e-mail, perpetrators of spam campaigns employed "botnets."  A "botnet" (derived from "robot network") was a network of computers infected with malicious software that allowed a third party to control the entire computer network without the knowledge or consent of the computer owners.  Each of the infected computers was referred to as a "bot."  A botnet could be used by spammers to send spam through the network of infected bot computers, using each of the infected computers to transmit the spam e-mail.  By sending the spam through the computers of other individuals, the spammers were able to hide the true origin of the spam, help the

spammer remain anonymous, and evade anti-spam filters and other spam blocking techniques.

    c.    Perpetrators of spam campaigns also employed "proxy computers."  These computers would accept incoming connections from any computer and then make outgoing connections to other computers.  Proxy computers could be used by spammers to camouflage the originating IP address[1] of a spammer's e-mail communication because the real IP address of the spammer would be replaced in the header with the IP address of the proxy computer making it difficult for recipients, Internet providers, or law enforcement to trace the spam e-mail back to its original source. Spammers often sent their spam e-mails through proxy computers to hide their identity, avoid being detected, and evade anti-spam filters and other spam blocking techniques.

## THE CONSPIRACY

    4.    From at least as early as in or about November 2007, through in or about February 2009, in the District of New Jersey and elsewhere, defendant

CHRISTOPHER RAD

did knowingly and intentionally conspire and agree with James Bragg, Promoter #1, B.T., D.S. and others to commit offenses against the United States, that is:

---

    [1]  An "IP address" or "Internet Protocol address" is a unique series of numbers (e.g., 94.23.82.23) assigned to a computer that is connected to the Internet.

- 7 -

(a) to use and employ, in connection with the purchase and sale of securities and through interstate commerce and the mails, manipulative and deceptive devices in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes and artifices to defraud, (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon holders of the securities and other members of the investing public, contrary to Title 15, United States Code, Sections 78j(b) and 78ff; and

(b) to materially falsify header information in multiple commercial electronic mail messages and intentionally initiate the transmission of such messages, contrary to Title 18, United States Code, Sections 1037(a)(3) and 1037(b)(1).

## OBJECT OF THE CONSPIRACY

5.   It was the object of the conspiracy to profit by creating artificial market demand for certain over-the-counter securities through (a) the use of spam and botnets to disseminate misleading press releases, (b) manipulative trading of securities by coordinating multiple purchases and sales of securities, and (c) selling shares owned or controlled by the coconspirators to the investing public at an artificially inflated price.

## MANNER AND MEANS OF THE CONSPIRACY

### Acquiring the Stock

6.    It was part of the conspiracy that Promoter #1 would seek as clients penny stock companies whose stock traded on the Pink Sheets.

7.    It was further part of the conspiracy that in exchange for his stock promotion services, Promoter #1 would be paid in advance in shares of his client's stock (the "Payment Shares").

8.    It was further part of the conspiracy that in order to negotiate the Payment Shares, Promoter #1 would contact attorneys, located in New Jersey and elsewhere, and seek opinion letters consistent with Rule 504.   To secure such opinion letters, Promoter #1 would falsely represent to the attorneys, among other things, that he was not in the business of stock promotion and that his principal place of business was in Texas.

9.    Once Promoter #1 received such an attorney opinion letter, he would send it to a transfer agent, who, in reliance on the opinion letter, would remove the restrictive legend from the Payment Shares, making them free-trading.

10.   It was further part of the conspiracy that because certain brokers required proof that shares of stock were being transferred for a legitimate purpose, when Promoter #1 would transfer shares of stock to defendant RAD and other coconspirators in furtherance of the conspiracy, he would create fraudulent "consulting agreements" representing that the shares

- 9 -

of stock were being transferred as payment for "consulting services," when, in fact, no such consulting services were to be performed.

### Pumping the Stock Value: Spam

11.   It was further part of the conspiracy that, after Promoter #1 received substantial quantities of unrestricted shares of stock from his clients, Promoter #1 would hire defendant RAD to coordinate the pump of the shares of stock through the use of unsolicited spam e-mails.

12.   It was further part of the conspiracy that defendant RAD, in turn, would retain Bragg and others to distribute throughout the United States spam e-mails touting the stocks, which defendant RAD and Bragg knew to be misleading.

13.   It was further part of the conspiracy that defendant RAD would provide Bragg with press releases and disclaimers, which defendant RAD and Bragg knew to be misleading, to distribute through spam e-mails.

14.   It was further part of the conspiracy that Bragg acquired lists of e-mail addresses from which to distribute spam (the "Purported Senders").  Bragg subsequently falsely represented himself as the Purported Senders, in part, by falsifying the header information within the spam e-mails.

15.   It was further part of the conspiracy that Bragg would periodically alter the spam e-mails to avoid spam-filtering techniques used by Internet service providers.

16.   It was further part of the conspiracy that Bragg and the coconspirators would disseminate and cause to be disseminated throughout the United States, including in the District of New Jersey, spam e-mails touting particular stocks that contained false and misleading information and failed to disclose material information, including (i) who paid for the e-mails, (ii) the quantity of shares of stock controlled by the coconspirators, and (iii) that the coconspirators intended to sell at the same time that they encouraged victim-investors to buy shares.

### Pumping the Stock Value: Botnets and Hacking

17.   It was further part of the conspiracy that defendant RAD and Bragg also retained third parties, including B.T. and D.S., who used botnets to distribute the spam e-mails.

18.   It was further part of the conspiracy that B.T. and D.S. would hack into brokerage accounts of third parties, including accounts maintained in New Jersey (the "Hacked Accounts").  B.T. and D.S. would liquidate the stock holdings in the Hacked Accounts and use the balance to purchase the stocks that defendant RAD was promoting, thereby creating the illusion that the stock was actively traded.

### Pumping the Stock Value: Cross-Trading

19.   It was further part of the conspiracy that defendant RAD, Bragg, Promoter #1 and others would further pump the market price and demand for stock by conducting manipulative

trading by secretly coordinating their trades to create the appearance of trading volume and active market interest.

20.  It was further part of the conspiracy that the coconspirators, including Promoter #1, would coordinate the dumping of shares of stock to unsuspecting victim-investors, including victim-investors residing in New Jersey, after the pump phase of the conspiracy had begun, thus earning illegal profits for the coconspirators.

21.  It was further part of the conspiracy that defendant RAD, Bragg, Promoter #1 and others would use Skype, an online instant messaging program, to communicate and coordinate the spam e-mails and manipulative securities trades.

## OVERT ACTS

22.   In furtherance of the conspiracy and to effect its
unlawful objects, defendant RAD and others committed and caused
to be committed the following overt acts in the District of New
Jersey and elsewhere:

a.   On or about December 7, 2007, Promoter #1 signed a
"Subscription Agreement" for the purchase of approximately
6,250,000 shares of stock of Company #1 at a price of $.08 per
share.   In fact, Promoter #1 did not pay for the shares, even
though approximately 6,250,000 shares were subsequently
transferred to accounts controlled by Promoter #1.   The
Subscription Agreement was false and fraudulent in that, among
other things, it falsely represented that the shares of Company
#1 were being acquired for Promoter #1's own accounts and not for
resale.

b.   On or about December 17, 2007, Promoter #1
transferred approximately 1,500,000 shares of stock of Company #1
from his brokerage account at a broker-dealer headquartered in
New York with the initials F.C. (hereinafter "F.C. Brokerage") to
an account at F.C. Brokerage in the name of defendant RAD as
advanced compensation for defendant RAD's coordination of a mass
e-mail campaign touting the stock of Company #1.

c.   To facilitate the transfer of shares from his
brokerage account at F.C. Brokerage to the account of defendant
RAD, Promoter #1 drafted a fraudulent "Consulting Agreement,"
which falsely claimed that defendant RAD was being paid 1,500,000

- 13 -

shares of stock of Company #1 for "corporate finance" consulting
services.  On or about December 10, 2007, defendant RAD signed
the fraudulent Consulting Agreement, which Promoter #1 then
caused to be sent to the compliance department at F.C. Brokerage.

### Spam

d.   On or about December 20, 2007, defendant RAD hired
Bragg to send spam e-mails touting the stock of Company #1.

e.   On or about December 20, 2007, Bragg sent defendant
RAD a Skype instant message informing him that he had begun the
spam e-mail campaign for Company #1 and that it was "runnin [sic]
hard hitting inbox on gmail, hot, yahoo, fusemail" and "should be
hitting others as well."

f.   On or about January 7, 2008, defendant RAD sent
Bragg a Skype instant message asking Bragg for a sample of the
mass e-mails that Bragg was sending regarding the stock of
Company #1.  In response, Bragg sent defendant RAD numerous
sample e-mails which, on their face, constituted unlawful spam e-
mails in that, among other things, they contained false header
information.

### Manipulative Trading

g.   On or about January 7, 2008, Bragg sent defendant
RAD a Skype instant message regarding the spam e-mail campaign
for the stock of Company #1 and asked defendant RAD to "bring the
bid up before open and ask down."  On the same day, defendant RAD
then sent a Skype instant message to Promoter #1 stating that
"someone need [sic] to bring the bid up before open."  In

response, Promoter #1 sent a Skype instant message to defendant RAD stating "I will."

h.   On or about January 7, 2008, Promoter #1, who already controlled more than 5,000,000 shares of stock of Company #1, purchased approximately 1,900 shares of stock of Company #1 in order to create the false appearance of a market to purchase such stock.   Also on or about January 7, 2008, Promoter #1 induced a nominee to purchase an additional 5,000 shares of stock of Company #1 to further create the false appearance of a market to purchase such stock.

i.   Between on or about December 27, 2007 and on or about January 28, 2008, as a result of the above-described pump and dump scheme relating to the stock of Company #1, Promoter #1 succeeded in selling approximately 450,000 shares of stock of Company #1 at prices ranging from $0.26 to $0.39 per share, and realized illicit gains of more than $150,000.

j.   On or about January 14, 2008, Promoter #1 traded shares of RSUV.   The trades were processed through a market-maker in or around Jersey City, New Jersey.

**Botnets**

k.   On or about February 13, 2008, defendant RAD asked D.S. for a copy of the logs regarding the transmission of spam. Defendant Rad and D.S. then exchanged the following over Skype:

Rad:   hey can you make your mailer show logs

D.S.:   I will ask my admin

Rad:   ya let me know

- 15 -

```
D.S.:   but you need to understand me too if I show my

        servers and [the SEC] will see it it is not

    good for me because spam goes from botnets

D.S.:   and it is not so good

D.S.:   and we can get any problems

Rad:    only talk about what I ask you

Rad:    understand!!

Rad:    I asked about loks

Rad:    logs!!!
```

Later, in the same Skype chat, D.S. said "it is important for me that these all not be shown to [the SEC], because my admin will have problems."

       1.   On or about March 26, 2008, defendant RAD and D.S. again had a Skype chat about botnets.  D.S. told defendant RAD that he bought new "bots" and updated his botnet system. Defendant RAD warned D.S. not to tell him about the bots:

```
Rad:    if you ever tell me you use bots I will block

        you

Rad:    I will go to jail for that

Rad:    you are f_cking stupid

D.S.:   ohh sorry

D.S.:   man

Rad:    tell your friend no bots

D.S.:   never tell [about] this again
```

Notwithstanding the fact that D.S. told RAD about the use of botnets, seconds later defendant RAD again engaged D.S.'s services for another spam campaign.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.    The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 371 set forth in Count 1 of this Indictment, the defendant

## CHRISTOPHER RAD

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and Title 28, United States Code 2461(c), any property which constitutes or is derived from proceeds traceable to such violation.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount subject to forfeiture under this paragraph.

3.    If any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

PAUL J. FISHMAN
UNITED STATES ATTORNEY

CASE NUMBER: _____

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

CHRISTOPHER RAD

INDICTMENT FOR

18 U.S.C. § 371

A True Bill,

PAUL J. FISHMAN
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

CHRISTOPHER J. KELLY
EREZ LIEBERMANN
*ASSISTANT U.S. ATTORNEYS*
*NEWARK, NEW JERSEY*
*973-645-6112 / 2874*