**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. Joel A. Pisano, U.S.D.J. |
| v. | : | |
| | : | |
| CHRISTOPHER RAD | : | Crim. No. 11-161 |
| | : | |
| | : | |
| | : | |

_____

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION**
**TO DISMISS THE INDICTMENT**

_____


Paul J. Fishman
United States Attorney
970 Broad Street; Suite 700
Newark, New Jersey  07102
(973) 645-2700



<u>On the brief</u>:

EREZ LIEBERMANN
ANDREW PAK
Assistant U.S. Attorneys

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   POINT I: THE INDICTMENT AND DISCOVERY PROVIDE AMPLE
   NOTICE OF THE CHARGED OFFENSES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   POINT II :DEFENDANT'S VOID FOR VAGUENESS MOTION IS SIMPLY A
   REHASHING OF THE *IN HAEC VERBA* ARGUMENT. . . . . . . . . . . . . . . . . . 11

   POINT III: SECTION 1037(a)(3) IS NOT OVERLY BROAD AND DOES NOT
   RUN AFOUL OF DEFENDANT'S FIRST AMENDMENT RIGHT TO FREE
   SPEECH.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   POINT IV:  SECTION 1037 DOES NOT RUN AFOUL OF DEFENDANT'S
   FIRST AMENDMENT RIGHT TO FREEDOM OF THE PRESS.. . . . . . . . . . . 16

   POINT V: DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE
   SHOULD BE DENIED BECAUSE HE DID NOT MEET HIS INITIAL
   BURDEN OF SETTING FORTH A COLORABLE CLAIM FOR RELIEF. . . . 18

   POINT VI: DEFENDANT'S MOTION FOR AN ORDER REQUIRING THE
   PRODUCTION OF *BRADY* EVIDENCE IS MOOT. . . . . . . . . . . . . . . . . . . . . . 19

   POINT VII: DEFENDANT HAS FAILED TO MEET HIS BURDEN OF
   DEMONSTRATING EXCEPTIONAL CIRCUMSTANCES FOR A RULE 15
   DEPOSITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## INTRODUCTION

Christopher Rad received over $2,000,000 in less than two years for his services in purported stock awareness campaigns.  Except, defendant Rad provided no services of his own. He was a middle man that connected stock promoters with spammers and hackers located overseas.  To effectuate his pump and dump scheme, he and his co-conspirators created false disclaimers in e-mails, engaged in manipulative stock trading, and entered into sham consulting agreements.  Overseas, his coconspirators used computers infected with a virus as part of a botnet and used other illegal techniques to distribute spam.  When one coconspirator told him about the botnets, he literally told him to stop telling him about it, and kept working with him.

Where law abiding citizens would turn away, defendant Rad kept going.  When he learned that one of the spammers did not follow the law, he kept using him.  When he learned that another spammer used botnets, he kept using him.  When a spammer asked him to note on the wire transfer that the money was for "Dell monitors," he kept using him.  When a spammer asked to be paid via third party countries, he kept using him.  Nothing phased defendant Rad in his pursuit of money.  He felt that as long as he told people to follow the law, he was safe.  But defendant Rad's repeated lip service to following the law was betrayed by his actions to the contrary.

Defendant Rad filed seven motions.  In support of these seven motions, which include requests to dismiss the indictment and suppress all the evidence, defendant Rad has cited a total of twelve cases, all but one of which are Supreme Court cases which provide general principles, but none of which contain analogous facts.  He has not cited a single case from the Third Circuit or any other district or circuit court.  Nor could he, as there is no support in the law for

1

defendant's motions.  Defendant Rad's motion to suppress the search warrant results, for example, is a boilerplate motion that contains not one cite.  Nor does it mention what, if any, alleged infirmity the warrant contained, be it probable cause, particularity, or overbreadth.  The void for vagueness motion likewise contains no cites and does not even attack the statute as vague, a critical omission in a void for vagueness motion.  Instead, defendant Rad uses his void for vagueness motion to ask for an order of proof regarding numerous allegations in the Indictment.  The boilerplate Brady motion was not even updated to refer to the District of New Jersey, as it asks that attorneys for the State of Texas turn over evidence in Texas's custody.  Defendant's additional motions are equally baseless, and should be denied.

## STATEMENT OF FACTS

In 2007, defendant Rad was approached by several stock promoters to assist in"stock awareness campaigns."  The stock promoters, including coconspirator D.E., sought defendant Rad's assistance in procuring the services of "mailers" to distribute news, new or old, about a particular stock.  The Superseding Indictment contains nine counts alleging that together with the promoters and mailers, defendant Rad engaged in securities fraud, sent spam by using false names and registration information, and sent spam through the unauthorized use of hijacked third party computers as part of a "botnet."

**Stock Promotions**

The promoters were typically hired by companies whose shares were traded over the counter.  The companies sought the promoters, such as D.E., as a means of raising capital.  In reality, the promoters were engaged in pump and dump schemes.  The promoters were typically paid by the companies in advance with restricted shares of the company's stock.  That is, the shares could not be freely traded.

D.E. and other promoters sought to effectuate the pump in the value of the stock in numerous ways, including purported e-mail "awareness" campaigns.  Through various connections in the industry, defendant Rad connected with D.E. and others and entered into deals whereby he would arrange the e-mail campaigns.  Defendant Rad was paid in cash and through shares of the stock to be promoted.

To transfer shares of restricted stock to defendant Rad, D.E. made misrepresentations to lawyers so he could secure letters which converted restricted shares to free-trading shares.   D.E. also entered into sham "consulting" contracts with Rad designed to persuade brokerage houses to

3

transfer the shares.  Rad never provided any consulting services, as he admitted in one of three interviews with the FBI.

**Mailers**

Defendant Rad did not generate the e-mail campaigns on his own.  Instead, he hired "mailers" that he found online.  To communicate with the mailers, Rad often used a messaging service known as Skype.  Hundreds of pages of Skype chats were found during searches in the FBI's investigation.  The Skype chats reveal that Rad found the mailers, paid them, and gave them "news" to put into the mailings.  The purported news was not always new "news."  Instead, Rad often regurgitated old articles, under the guise that even information the market already absorbed could generate interest in a company.

In chatting with the mailers, defendant Rad invariably asked if they complied with the CAN-SPAM laws and had lists of people who actually wanted spam e-mail.  Rad's statements about CAN-SPAM, however, were hollow.  He knew that the mailers did not comply with CAN-SPAM, and simply chose to pretend otherwise.  He also never stopped dealing with a mailer that was not compliant, he simply offered an empty promise to help the mailer become compliant.

Rad paid his mailers by means consistent with the dark alley transactions he was undertaking.  One mailer, D.S., was paid through wires sent to third party countries, including Canada, Poland, New Zealand, British Virgin Islands, Spain, United Kingdom, Cyprus, and Seychelles.  In the comments section explaining the purpose of the wires, Rad provided false statements, never indicating that the payment was for stock promotion or mailings.  Additionally, Rad often had to change his methods of paying the same mailer, using wires, digital currency, and third-party payors.

4

To generate widespread mailings and avoid spam filters established by the e-mail providers, the mailers had to use sophisticated techniques.  One of Rad's mailers employed a botnet, which is a collection of computers infected with a virus and controlled by the "bot herder."  Rad knew that D.S. used a botnet to distribute his spam.  An additional technique for avoiding spam filters was the use of false names, email addresses and e-mail addressing information.  Rad's mailers used each of these techniques and Rad received samples of the e-mails.  Indeed, Rad sometimes inquired about the type of mailings and how they would get to inboxes.

**Manipulative trading**

Mailings that relied on old news, no matter how widely distributed, were insufficient to pump up the value of the stock.  Defendant Rad therefore had to work with the promoters and mailers to create extra incentive for the recipients of the spam to trade.  Rad, D.E., and others engaged in manipulative stock trading designed to create the impression that there was interest in the stock being promoted.   Defendant Rad also made false representations in the disclosures found at the bottom of the mailings, misrepresenting the amount of money he was making and the amount of shares he would dump when the stock value was pumped up.

**The FBI's Investigation**

In 2007, the FBI learned that trades going through Knight Securities, located in New Jersey, and at accounts maintained at broker-dealers were breached by hackers.  The hackers subsequently liquidated the shares in the account and used the money in the account to buy shares of stocks that were in the midst of pump and dump schemes.  By refraining from taking the money directly out the account, the hackers were avoiding a money trail.  One such hacker

5

was D.S., whose contributions to the pump and dump schemes also included sending spam
through botnets.

The investigation revealed that on 22 different occasions, relating to 22 account
intrusions, and 22 pump and dump schemes, Rad paid D.S. tens of thousands of dollars the day
after the account intrusions occurred.

**Searches**

Searches of e-mail accounts and review of subpoenaed bank account records led the
investigation to D.E., defendant Rad, and others.  In February 2009, pursuant to search warrants
authorized by Magistrate Judges in the respective districts, the FBI conducted simultaneous
searches in Florida, Texas and California, including Rad's home and business in Texas.  The
results revealed the Skype chats discussed above and numerous other records.

**Interviews**

During the search of his residence, defendant Rad agreed to talk with the FBI agents
without counsel present.  He was not in a custodial situation at the time.  Subsequently,
defendant Rad traveled to the U.S. Attorney's office to conduct to interviews with the FBI, SEC
and U.S. Attorney's office.  He was represented by counsel at both interviews.  No proffer letter
was offered or requested.

**The Indictment and Discovery**

Defendant Christopher Rad was charged by Indictment on March 17, 2011, and a
Superseding Indictment on January 12, 2012.   The 25-page detailed Superseding Indictment lays
out the specific manner and means employed by the conspirators to perpetrate the charged
conspiracy, commit securities fraud, and distribute spam through false registration information

6

and botnets.  The indictment includes two conspiracy counts and seven substantive counts. Defendant Rad is identified as a middle-man, connecting the stock promoters with skilled hackers and spammers.

Since the date of the Indictment, the Government has disclosed 5,680 pages of bates-marked documents.  In addition, defendant has requested and received copies of the contents of an additional 15 CDs, one DVD, and over 4 terabytes of data.  The discovery includes memos summarizing defendant's voluntary statements to law enforcement; bank and brokerage records; internet chat conversations between defendant and others; e-mail accounts of defendant and others; defendant's own work files from his computer; e-mails collected by the Federal Trade Commission regarding spam; and other Rule 16 discoverable material.

7

**ARGUMENT**

**POINT I**

**THE INDICTMENT AND DISCOVERY PROVIDE AMPLE
NOTICE OF THE CHARGED OFFENSES**

Defendant argues that the Government did not provide the indictment *in haec verba*.[1]

Under Rule 7(f) of the Federal Rules of Criminal Procedure, "the court may direct the

government to file a bill of particulars." The Rule further specifies that "[t]he defendant may

move for a bill of particulars before or within 10 days after arraignment or at a later time if the

court permits." Here, a motion for a bill of particulars was not filed "before or within 10 days

after arraignment." Instead, months after the Superseding Indictment, which used much of the

language from the initial Indictment, defendant made his motion, which essentially seeks an

order of proofs from the Government.

In *United States v. Urban*, the Third Circuit explained:

> The purpose of the bill of particulars is to inform the defendant of the nature of
> the charges brought against him, to adequately prepare his defense, to avoid
> surprise during the trial and to protect him against a second prosecution for an
> inadequately described offense. *Only where an indictment fails to perform these
> functions, and thereby "significantly impairs the defendant's ability to prepare his
> defense or is likely to lead to prejudicial surprise at trial[,]" will we find that a
> bill of particulars should have been issued."*

404 F.3d 754, 771-72 (3d Cir. 2005) (citations omitted) (emphasis added). Here, the

Superseding Indictment provides details not only about the time of the alleged conspiracy, but

also of the particular individuals and stocks involved in the conspiracy. Defendant is on notice

---

[1]While defendant did not identify his motion as one for a bill or particulars, both *Bartell
v. United States*, 227 U.S. 427 (1913) and *Rosen v. United States*, 161 U.S. 29 (1896), cited by
defendant, are cases in which the Court discusses the issue as one for a bill of particulars.

that the conspiracy relates to his interaction with these individuals during certain dates. Specifically, the Superseding Indictment is clear that the charged conduct relates to any pump and dump schemes carried out through spam campaigns from 2007 through 2009.  These facts alone provide defendant with a clear delineation of the time frame, coconspirators and stocks involved in the conspiracy and remove any possibility of a second prosecution for an inadequately described offense.

The Government need not rely on the Superseding Indictment alone to fully apprise defendant of the charges against him, permit an adequate defense, and avoid the prospect of future prosecutions.  Extensive discovery is an additional avenue by which the Government may satisfy its obligations of particularity.  *See Urban*, 754 F.3d at 772 (finding that extent of discovery weakens case for bill of particulars) (*citing United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir.1979) ("Full discovery . . . obviates the need for a bill of particulars.")); *United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991).  For this reason, motions for a bill of particular are appropriate immediately after the indictment, when no discovery can aid a defendant.

In the present case, defendant has received full discovery, including copies of spam e-mail collected by the FTC, copies of internet chats which further included verbatim language included in spam e-mails, copies of e-mails sent to defendant; and 5,680 pages of additional bates-stamped discovery.  Considering the detailed allegations set forth in the Superseding Indictment and the extent of discovery, a bill of particulars is not necessary to apprise defendant of the nature of the charges or avoid the possibility of a second prosecution.  Nor is a bill of particulars necessary to address defendant's argument that more details are necessary about venue.  The Superseding Indictment contains allegations of conduct in New Jersey, and the

Government has produced discovery relating to New Jersey.

Defendant relies on *Bartell v. United States*, 227 U.S. 427 (1913) and *Rosen v. United States*, 161 U.S. 29 (1896) for the proposition that the exact words of a fraud must be provided. However, neither of these cases stands for the cited proposition, as the cases merely speak to the proposition that in cases of obscenity, exact words are not required. Nor has defendant cited a case from the last 99 years that addresses this issue. Instead, defendant spends seven pages quoting from the indictment and alleging that the exact words of the fraud must be copied.

In *United States v. Moyer*, the defendant was accused of false statements. The defendant moved for a bill of particulars and was denied. The Third Circuit affirmed the denial and explained that the Government need not identify in the pre-trial phase each "omission or inclusion that rendered false the documents . . ." 674 F.3d 192, 203 (2012). The court stated that a bill of particulars was needed when an indictment merely quoted the language of a statute, not where additional facts are provided. *Id.* The court went on to quote *United States v. Addonzio*: "'[A]t the pre-trial stage, [the Government is not required to] weave the information at its command into the wrap of a fully integrated trial theory for the benefit of the defendant.'" *Id.*, citing *Addonzio*, 451 F.2d 49, 64 (3d Cir. 1971).

Consistent with *Moyer*, the Government has far exceeded the requirements for a bill of particulars, both with the very much "speaking" Superseding Indictment and the extensive discovery. The Government respectfully submits that no additional information is required and defendant's motion for a bill of particulars should be denied.

10

## POINT II

### DEFENDANT'S VOID FOR VAGUENESS MOTION IS SIMPLY A REHASHING OF THE *IN HAEC VERBA* ARGUMENT

Defendant moves to dismiss the indictment under the void for vagueness doctrine. However, defendant's void for vagueness motion is simply a request for more particular facts, not a void for vagueness challenge to a statute.  Defendant cites no law in his void for vagueness motion, presumably because he has misapplied the legal provisions for his challenge.

A void for vagueness argument can be made against <u>statutes</u> which are unconstitutionally vague.  In criminal matters, such challenges must be "as applied".  *United States v. Mazurie*, 419 U.S. 544, 550 (1975).  In the only published decision on the matter, the District Court for the Southern District of California found that Title 18, United States Code, Sections 1037(a)(3) and (a)(4) were not void for vagueness.  475 F.Supp. 2d 1019, 1023 (S.D. Cal. 2007).

However, defendant's void for vagueness motion does not attack the statute.  Instead, defendant argues that the Superseding Indictment is vague in that many statements within the Superseding Indictment can be interpreted in different ways.  Defendant spends pages 2 through 6 of his motion arguing that statements in paragraphs 1-3of the Superseding Indictment, the "Background" section, are vague.   He then attacks other statements as either vague, false, or lacking proof.  For example, in paragraph S of his motion, defendant quotes paragraph 28c of the Superseding Indictment, which states:  "[the e-mail] falsely claimed that defendant Rad was being paid 1,500,000 shares of stock of Company #1 for 'corporate finance' consulting services." Defendant attacks this statement because the "indictment should state how the claim is false." Not only is this not a void for vagueness challenge, it is also not a legitimate request for a bill of

11

particulars.  Instead, defendant is seeking the Government's order of proofs.  In support of his requests, defendant has not cited a single case.  As explained with respect to defendant's motion for a bill of particulars, the Government has satisfied its pleading requirements and need not lay out a full order of proofs in advance of trial.

## POINT III

## SECTION 1037(a)(3) IS NOT OVERLY BROAD AND DOES NOT RUN AFOUL OF DEFENDANT'S FIRST AMENDMENT RIGHT TO FREE SPEECH

Defendant moves to dismiss the indictment under the overbreadth doctrine, arguing that Title 18, United States Code, Section 1037(a)(3) violates his free speech rights under the First Amendment of the United States Constitution.  Although styled as a motion to dismiss the indictment, the defendant's motion focuses exclusively on Section 1037(a)(3), which is relevant to only a portion of Count One of the Superseding Indictment.   Count One alleges a conspiracy to commit three types of offenses against the United States:  (a) securities fraud contrary to Title 15, United States Code, Sections 78j(b) and 78ff; (b) illegal spamming contrary to Title 18, United States Code, Section 1037(a)(3); and (c) illegal spamming contrary to Title 18, United States Code, Section 1037(a)(4).  Defendant's motion focuses only on the criminal objective described in paragraph 4(b) of the Superseding Indictment.  Nevertheless, Section 1037(a)(3) does not run afoul of defendant's First Amendment rights.

Defendant Rad claims that Section 1037(a)(3) is overly broad because it "punishes any email transmission because it is at least IN interstate commerce by virtue of being on the internet."  Def. Mtn at 3.  However, reference to Section 1037(a)(3)'s statutory language clearly undermines Defendant's assertion.  As set forth in his own papers, Section 1037(a)(3) applies only where: (1) header information is materially falsified; (2) the material falsification applies to multiple email messages; (3) the email messages are commercial in nature; and (4) their transmission is intentionally initiated.

As support for his assertion that Section 1037(a)(3) violates the First Amendment,

defendant Rad relies on the Virginia State Supreme Court opinion of *Jaynes v. Commonwealth*, 666 S.E.2d 303 (Va. 2008).  However, in *Jaynes*, the statute at issue was a Virginia State statute that the *Jaynes* court itself found to be distinguishable from the CAN-SPAM Act.  *Jaynes*, 666 S.E.2d at 313 (striking down the Virginia statute criminalizing all unsolicited bulk email, including email containing political speech, while distinguishing the Virginia statute from the CAN-SPAM Act which focused on commercial bulk email).[2]  Indeed, the *Jaynes* court premised its holding on the fact that the Virginia statute was overly broad because it was "not limited to instances of commercial or fraudulent transmission of e-mail" and that the Virginia statute's broad language did not lend itself to a narrowing construction making it applicable only to commercial email, email involving criminal activity, defamation, or obscene material.  *Id.* at 313-14.

Indeed, an overbreadth analysis is not even applicable here because the "overbreadth doctrine does not apply to commercial speech."  *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 497 (1982) (citing *Cent. Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 565 n.8 (1980)); *see also Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000) (recognizing the "limitation of an overbreadth challenge in the commercial context"); *see, e.g.*, *United States v. Simpson*, Crim., 2011 U.S. Dist. LEXIS 76881, at *77-82 (July 15, 2011) (declining to apply the overbreadth doctrine to companion sections to Section 1037(a)(3)); *United States v. Smallwood*, Crim., 2011 U.S. Dist. LEXIS 76880, at *73-77 (July 15, 2011) (same).

---

[2]Although the *Jaynes* court cited the act's civil provisions, Section 1037(a)(3) like its civil counterpart applies only to commercial emails, as indicated in the text of the statute.

14

Finally, Defendant appears to argue that Section 1037(a)(3) does not survive the balancing test set forth in *Cent. Hudson Gas & Elec*. (Free Speech Motion at 4.)  However, the Supreme Court in *Cent. Hudson Gas & Elec.* held that a First Amendment balancing inquiry only applies where the commercial speech in question concerns lawful activity that is not misleading. *See Cent. Hudson Gas & Elec.*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").  Here, not only does the Superseding Indictment allege that the content of the spam sent by defendant Rad is misleading and was used to promote an unlawful "pump and dump" scheme, but the statute itself only applies to commercial bulk emails with headers that are falsified to make them materially misleading to the recipient.

## POINT IV

### SECTION 1037 DOES NOT RUN AFOUL OF DEFENDANT'S FIRST AMENDMENT RIGHT TO FREEDOM OF THE PRESS

Defendant argues that Title 18, United States Code, Section 1037 violates the United States Constitution's guarantee of the freedom of the press.  *See* Defendant's Motion to Dismiss Freedom of the Press ("Free Press Motion").  Defendant does not specify which counts  he is challenging, but appears to be challenging all of the counts premised on any subsection of Title 18, United States Code, Section 1037.

Defendant Rad grounds his argument in a line of cases that are wholly inapposite.  The cases cited in the Free Press Motion all involve prior restraints on speech of a commercial nature regardless of whether that speech is truthful or misleading.  *See Lowell v. City of Griffin*, 303 U.S. 444, 450-51 (1938) (a complete ban on the distribution of any literature without a license); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 749 (1976) (a complete ban on any advertisement in any manner by a licensed pharmacist); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 355 (1977) (a complete ban on advertisement of legal services); *Cent. Hudson Gas & Elec.*, 447 U.S. at 558 (a complete ban on all promotional advertising by an electrical utility); *Lowe v. SEC*, 47 U.S. 181, 183 (1985) (a permanent injunction preventing the publication of any "nonpersonalized investment advice and commentary in securities newsletters because they are not registered as investment advisers under … the Investment Advisers Act of 1940").

However, here there is no prior restraint on speech, and indeed there is no ban on anyone's ability to disseminate commercial speech.  Section 1037 does not ban the content of any

16

commercial messages but requires that the sender not mislead the recipient as to the source of the message.  In other words, Section 1037 compels disclosure of accurate information regarding the source of commercial email messages, and does not punish the dissemination of such messages when the disclosure is properly made.  Unlike "[r]egulations on nonmisleading commercial speech [which] triggers [a] form of intermediate scrutiny …. Disclosure requirements for commercial speech trigger a rational basis test."  *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010) (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)); *see United States v. Bell*, 414 F.3d 474, 484-85 (3d Cir. 2005) ("In a commercial setting, the government may impose reasonable regulations on content to prevent deception of customers").  Here, Section 1037 applies only to commercial email messages, and only where the recipient is materially misled as to the source of the message.

**POINT V**

**DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE SHOULD BE
DENIED BECAUSE HE DID NOT MEET HIS INITIAL BURDEN OF SETTING
FORTH A COLORABLE CLAIM FOR RELIEF**

A defendant seeking to suppress evidence bears the initial burden of proof to establish a basis for his claim.  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  Further, a "defendant's moving papers must demonstrate a 'colorable claim' for relief …. [and] [i]n order to be 'colorable,' a defendant's motion must consist of more than mere bald-faced allegations of misconduct."  *United States v. Cummings*, 156 Fed. Appx. 438, 444 (3d Cir. 2005).

Here, Defendant's boilerplate motion to suppress is devoid of anything other than bald-faced, vague, and conclusory allegations.  The motion moves to suppress essentially all seized evidence, all statements made by defendant in connection with this case, all testimony of law enforcement officers concerning their observations of defendant, and all testimony of anyone concerning any such evidence.  The ground presented in the motion is simply the broad statement that all of the seized evidence was seized either without a warrant, without probable cause, or without other lawful authority.  These assertions are false and simply too broad and conclusory to set forth a colorable claim for relief.

18

**POINT VI**

**DEFENDANT'S MOTION FOR AN ORDER REQUIRING THE
PRODUCTION OF *BRADY* EVIDENCE IS MOOT**

Defendant moves this Court to enter an order requiring the disclosure of any exculpatory or mitigating evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  However, defendant's motion is clearly a boilerplate motion taken from another proceeding.  It seeks that the <u>State of Texas</u> prosecutor produce *Brady* material in the possession of the <u>State of Texas</u>.

A correctly filed motion would be moot in light of this Court's Standing Order for Discovery and Inspection, entered on April 25, 2011, requiring the exact disclosure that defendant seeks.  The Government is in compliance with this Court's order and will continue to provide any *Brady* material if it exists and is discovered.

19

## POINT VII

### DEFENDANT HAS FAILED TO MEET HIS BURDEN OF DEMONSTRATING EXCEPTIONAL CIRCUMSTANCES FOR A RULE 15 DEPOSITION

Defendant moves to depose a witness, Scott Miller, outside of the United States pursuant to Rule 15 of the Federal Rules of Criminal Procedure.  As the Third Circuit Court of Appeals has stated, "[a]ttendance of witnesses . . . is the favored method of presenting testimony, and primarily for this reason depositions are not favored in criminal cases."  *United States v. Wilson*, 601 F.2d 95, 97 (3d Cir. 1979).  Rule l5(a) itself states that courts should order depositions to be taken only in "exceptional circumstances" and when "it is in the interest of justice" to do so.  Fed. R. Crim. Pro. 15(a)(1).  As the *Wilson* court stated, "[t]he antipathy to depositions is due in large part to the desirability of having the factfinder observe witness demeanor."  *Id.*; *see also United States v. Mueller*, 74 F.3d 1152, 1156 (11th Cir. 1996) ("Depositions, particularly those taken in foreign countries, are generally disfavored in criminal cases.").

The Third Circuit has stated that two factors to consider in determining whether a movant has established exceptional circumstances are whether the witness's testimony is material and the witness's availability.  *United States v. Ismaili*, 828 F.2d 153, 159-61 (3d Cir. 1987).  Courts typically expect a defendant seeking a foreign deposition to make "some showing, beyond unsubstantiated speculation, that the evidence exculpates [him]."  *United States v Kelley*, 36 F.3d 1118, 1125 (D.C. Cir. 1994).  Defendant Rad asserts that Miller's testimony is material because he can provide narration, but does not explain why that narration would bear upon defendant's guilt or innocence.  Defendant Rad also asserts that Miller is unwilling to travel to the United States, but does not proffer what is hindering such travel, be it financial or otherwise.

Defendant's unsubstantiated claims are insufficient to meet the burden established by the courts.  Only after defendant provides greater information can the Government respond to defendant's suggestions.  Additionally, defendant has stated that he would not travel to the deposition, but would be available by teleconference.  If a deposition was ordered, the Government would certainly want a live deposition, not one over video-conference.

## <u>CONCLUSION</u>

The Government respectfully asks the Court to deny defendant's motions.


Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

/s/ Erez Liebermann

By:  EREZ LIEBERMANN
ANDREW PAK
Assistant U.S. Attorneys


Dated: October 19, 2012
        Newark, New Jersey

22